IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Case No. 19-cr-00245-WJM

UNITED STATES OF AMERICA,

v.

CHRISTOPHER LYMAN

---

**MOTION FOR NON-GUIDLINE SENTENCE**
_____

The Defendant, CHRISTOPHER LYMAN, by and through Aviso Law LLC, hereby moves the Court to issue a sentence outside of the guideline range pursuant to 18 USC § 3553. Specifically, Mr. Lyman requests that the Court impose a probationary sentence, or in the alternative, a sentence of in-home detention. In support thereof, the Defendant states as follows:

## FACTS

**Background**

1. Mr. Lyman is a fifty-three (53) year old male. *See* Presentence Investigation Report (hereinafter PSR), Doc. # 39, p. 2. Mr. Lyman has absolutely no criminal history whatsoever. *Id*, p. 9. Since being released on bond, Mr. Lyman has had zero problems or violations while on pretrial release. *Id*, p. 3. The combination of these factors show that the acts committed by Mr. Lyman were an aberration from his establish character, that he has an extremely low likelihood of reoffending and that if given a non-Department of Corrections (DOC) sentence, he is highly likely to succeed.

2.  Until the events in this case, Mr. Lyman was a completely typical, productive and contributing member of Colorado's community.  He grew up in a normal traditional Colorado family where he was the only child – though his mother did have three older children from a previous marriage.  *Id*. p. 10.  He had supportive loving parents who were appropriately involved in his life, and he did not experience any traumatic events while growing up.  *Id.*

3.  Included with this pleading is a sentencing video created for the Court.  *See* Sentencing Video, attached here to as **Exhibit 1** – a hard copy of which has been provided to the Clerk of Court and the Probation Department.  As discussed in this video, Mr. Lyman's upbringing was of the sort that he developed a very close bond with his parents.  *Ex.* 1.  This later becomes relevant to his actions in this case.

4.  After high school, Mr. Lyman enlisted in the Army, but unfortunately this experience was cut short due to medical conditions that arose.  *PSIR*, p. 14.  Following the medical discharge, Mr. Lyman attended Metro State University for a few semesters before leaving to pursue his professional career.  *Id*, at 13.  Eventually, Mr. Lyman joined a national audio-visual company that provided services to hotels around the nation for events such as conferences.  *Id.*   Until his employment with this company was suspended due to COVID-19, Mr. Lyman had spent nearly twenty-three (23) years with this company.  *Id.*  Prior to COVID-19, Mr. Lyman was serving as the company's National Special Projects Manager, where he earned a salary of $69,000.  *Id.*  Should COVID-19 subside and Mr. Lyman's industry return following the pandemic, Mr. Lyman hopes to continue his employment with this company in the event that a sentence from

2

this Court does not prohibit him from doing so. *Id.*

5. Mr. Lyman has two adult children, both of whom have grown up to be well-adjusted adults with productive lives and families of their own. *See* Ex. 1.

6. Mr. Lyman owns his house (with a mortgage), and it is a well-kept four (4) bedroom, three (3) bathroom townhome in Arvada, Colorado. *PSIR*, p. 11.

7. Since losing his employment with the audio-visual company, Mr. Lyman has obtained employment with Uber as a driver earning nearly $3,600 per month (gross). *See* Objections to PSIR, Doc. # 40, pp. 4-5. This provides Mr. Lyman with a stable reliable income where he can pay his mortgage and maintain the other stability factors in his life. If Mr. Lyman is sentenced to the DOC, it is likely that he will lose his house as well as other stability factors in his life.

**The Underlying Events**

8. It was with these factors and conditions that Mr. Lyman was placed in very difficult circumstances in 2018 and 2019. Following the death of his mother in 2014, Mr. Lyman became the primary caretaker of his father, Kenneth Lyman. Kenneth was diagnosed with cancer and as a result, huge medical bills followed. *See* Ex. 1. This was made worse by the fact that Mr. Lyman's father would cycle through improving and declining health throughout the cancer battle. *Id.* This prolonged the illness and resulted in greater financial strain on Mr. Lyman.

9. In his attempt to find supplemental income in ways that would not impact his primary job, Mr. Lyman turned to Bitcoin. One of the difficulties that owners of Bitcoin have is the difficulty of exchanging the virtual currency for real currency. The challenge

3

of converting the virtual currency to actual currency is made worse through highly erratic trading value. Mr. Lyman saw this as an opportunity to help people exchange Bitcoin for actual currency, and he began exchanging other people's Bitcoin for cash and then attempting to make a profit on the volatility of the currency (the daily traded value). These initial exchanges were akin to two individuals trading British Pounds for Dollars and attempting to make money on the exchange rate. Mr. Lyman's initial trades happened in small dollar values, such as small thousands of dollars. Mr. Lyman was not at any point working with individuals involved in illegal drugs, to his knowledge.

10. As part of Mr. Lyman's attempts to find people who he could trade the currency with, he posted an advertisement on Craigslist offering to exchange cash for Bitcoin. *PSIR*, p. 4. This advertisement was identified by the DEA and they reached out to Mr. Lyman via a confidential source. *Id.* Through the communications with the DEA, it was proposed to Mr. Lyman that he could exchange Bitcoin for cash to help launder money for an illegal drug operation.

11. It is important to note at this juncture that Mr. Lyman did not seek out those involved in the illegal drug trade as part of his Bitcoin exchange business. It was not Mr. Lyman's intent when beginning his Bitcoin venture to enter into illegal activity. Nonetheless, Mr. Lyman also did not cutoff ties when he learned that the confidential source he was speaking to was involved with marijuana. This was the first in a series of several small bad decisions that led to Mr. Lyman ultimately agreeing to essentially launder drug money. Mr. Lyman describes this series of bad choices in his Sentencing Video. *See* Ex. 1.

4

12.  Mr. Lyman agreed to the exchanges because he could earn a commission on the Bitcoin for cash exchange, unlike attempting to profit from Bitcoin for cash exchanges where profitability was riskier due to Bitcoin's volatile daily traded value. This was important to Mr. Lyman because of his need for money to pay for his father's medical bills and because of his close relationship with his father.  *Id.*

13. Ultimately, Mr. Lyman entered into five exchanges with the DEA, totaling $197,000.  *PSIR*, p. 8.  Of this amount, $134,000 came from Mr. Lyman and the remainder came from an associate during the final transaction with the DEA.  *Id*, pp. 3-4.  Of the total amount, $15,000 involved the exchange of checks (from the DEA) for cash (from Mr. Lyman).

**Additional Relevant Facts**

14.  Following Mr. Lyman being taken into custody on May 17, 2019, he immediately agreed speak with the DEA.  This was based upon an immediate realization of the mistakes he had made.  Beyond this, Mr. Lyman requests that the Court consider Doc. # 40.

15.  As it relates to COVID-19, a factor relevant to all 2020 sentencing proceedings, Mr. Lyman contracted COVID-19 in June 2020.  Despite this, according to the Center for Disease Control, it appears possible to contract the virus twice.  *See https://www.cdc.gov/coronavirus /2019-ncov/if-you-are-sick/end-home-isolation.html.* Beyond COVID-19, Mr. Lyman also has other chronic physical health conditions such as urticaria (hives) where he experiences outbreaks that require treatment several times per month.  *PSIR*, pp. 11-12.  It is unlikely that Mr. Lyman will receive the necessary

treatment within the DOC.

16. As it relates to his mental health, Mr. Lyman has been diagnosed with depression and anxiety. *Id*, at 12. While these diagnoses are currently being managed without many issues, any sentence to the DOC is likely to result in the deterioration of Mr. Lyman's mental health due to limited management of mental health conditions within the DOC.

## **ARGUMENT**

As a result of the invalidation of the mandatory nature of the sentencing guidelines, the Court has greater discretion in determining the appropriate sentence in this case. *See United States v. Booker*, 543 U.S. 200 (2005); *Gall v. United States*, 552 U.S. 38, 46 (2007). In determining what sentence to impose, the Court is required to consider a number of factors in addition to the sentencing guidelines pursuant to 18 U.S.C. § 3553. As explained in the relevant portions of the statute:

> The court shall impose a sentence sufficient, b*ut not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, *shall* consider—
>
> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(2)** the need for the sentence imposed--
>    **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>    **(B)** to afford adequate deterrence to criminal conduct;
>    **(C)** to protect the public from further crimes of the defendant; and
>    **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> **(3)** the kinds of sentences available;
>
> **(4)** the kinds of sentence and the sentencing range established for--
>    **(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines
>
>    **. . . .**
>
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> **(7)** the need to provide restitution to any victims of the offense.

18 USCS § 3553.

1. **The Nature of the Offense and the History and Characteristics of Mr. Lyman Weigh in Favor of a Sentence of Probation or In-Home Detention.**

As discussed in the facts section above, Mr. Lyman has absolutely no criminal history. This is particularly notable because he is fifty-three (53) years old, which means that he has gone nearly a lifetime without committing a single criminal offense. As it applies to the Court's consideration of a probationary or in-home detention type sentence, track record is everything. Mr. Lyman's track record shows that he can follow the law, and this has borne out during the seventeen (17) months of his pretrial release where he has not violated the conditions of release and has done well, even *without* supervision. *PSIR*, p. 3.

Mr. Lyman has several stability factors in his life that would be either completely destroyed or severely diminished if the Court imposes a DOC sentence. Most meaningful amongst these stability factors is that Mr. Lyman own a house and he has meaningful employment. Though the nature of that employment has changed from

7

working as the National Special Projects Manager to that of an Uber driver, he nonetheless makes enough money to pay his mortgage, and once COVID-19 clears up next year, he's likely to regain employment with the company that he was employed with for over twenty-three (23) years. Should the Court impose a DOC sentence, Mr. Lyman is likely to lose his house to foreclosure and miss-out on any opportunity to regain his employment with J and S Audio Visual. At the same time, if the Court imposes a probationary or in-home detention sentence, Mr. Lyman is likely to maintain the stability factors, including his house and employment.

Given Mr. Lyman's chronic health conditions (hives) and mental health diagnoses, it is unlikely that the DOC will be able to mange these conditions sufficiently. It is unlikely that any facility in the DOC will be able to adequately manage the chronic outbreak of hives that occurs several times per month, and it is widely accepted that those with mental health conditions tend to deteriorate in prison. Balancing these conditions against the victimless nature of the crime, the Court can appropriately sentence Mr. Lyman with a sentence to probation or in-home detention where his medical conditions could be adequately managed and treated.

Taken together, the history and characteristics of Mr. Lyman weigh in favor of a probationary sentence.

As it applies to the offense itself, it is important to note that it was not a crime of violence, no weapons were used and essentially there is no victim since every transaction from the very first was with the DEA. The offense was also not a crime of opportunity or exploitation. What drove Mr. Lyman's decision to engage in the illegal

8

conduct was life circumstances – specifically his father's cancer diagnoses and the resulting medical bills.  It is also significant that Mr. Lyman did not immediately turn to illegal activity to supplement his income.  Instead, he sought to trade currency and make money off an exchange rate.  It was not until the DEA responded to his Craigslist post playing the role of somebody involved in drugs, that Mr. Lyman became aware of a more profitable way to make money for his father's medical bills, which in turn caused him to let down his guard and veer from fifty-two (52) years of lawful and moral conduct.  This shows that even though Mr. Lyman's conduct was certainly illegal, and even though he carried through with five (5) transactions with the DEA, what led up to those transactions and how he became involved in those transactions is mitigating.

Regarding the five transactions with the DEA, the way the DEA handled those transactions artificially inflated Mr. Lyman's criminality.  The DEA could have arrested Mr. Lyman after the first $1,000 transaction or after the second $5,000 transaction, or even after the third $15,000 transaction.  Instead, the DEA continued with the transactions, each time upping the dollar-value of the exchange despite having probable cause and being on perfectly solid legal ground to arrest and charge Mr. Lyman.  The result of this within the realm of the United States Sentencing Guidelines (USSG) is that, had the DEA arrested Mr. Lyman after the first two transactions, the base offense level would have been 8.  This is calculated with a base offense level of 6 under USSG § 2S1.3 plus 2 under the § 2B1.1 table.  Had the DEA arrested Mr. Lyman after the third transaction, the base offense level would have been 10.  Ultimately, the DEA just kept going and pushing the exchange values up when doing so was unnecessary to

9

establish the commission of a crime or Mr. Lyman's intent. The end result was the unnecessary inflation of criminality under the §2B1.1 table. Considering this, it would be appropriate for the Court to depart downward and consider alternative sentencing options such as probation or in-home detention.

### 2. A sentence of Probation or In-Home Detention Furthers the Purposes Set Forth in Paragraph Two of 18. U.S.C. 3553(a)(2).

Many of the offense characteristics discussed in the previous section set the stage for how an appropriate sentence should be analyzed under this factor. In this case, where the offense was not a crime of violence, did not involve weapons, was not exploitative and was essentially victimless, a probationary sentence or sentence to in-home detention is appropriate. Under any circumstance, Mr. Lyman is going to walk away from this proceeding convicted of a federal felony and being penalized with the numerous consequences the accompany such a conviction. Where every single transaction in this case was executed with the DEA, and where there is no evidence that Mr. Lyman was seeking out opportunities to launder money or do business with those involved in the illegal drug trade, the conviction accompanied with a period of probation or in-home detention appropriately punishes Mr. Lyman for his conduct and reflects the seriousness of the offense. Such a sentence also accounts for the fact that the DEA itself tipped the scales regarding the seriousness of the offense by conducting unneeded transactions with Mr. Lyman which resulted in running up the dollar value on the §2B1.1 table.

A sentence of probation or in-home detention is also appropriately deterrent – especially in 2020 where courts across the nation are sentencing non-violent offenders

with sentences such as probation or in-home detention to reduce prison capacity. Given these considerations, a probationary or in-home detention sentence sends a message of general deterrence.

In the case of Mr. Lyman, the conviction itself is sufficient for the purposes of specific deterrence and protecting the public.  The conviction, coupled with Mr. Lyman's fifty-two (52) years of living crime free and seventeen (17) months of pretrial release without incident, shows that Mr. Lyman is extremely unlikely to commit any additional offenses during his lifetime and that a sentence of probation or in-home detention is appropriate.

### 3. Probation and In-Home Detention are Amongst the Available Sentences to the Court.

While the Sentencing Guidelines do not make Mr. Lyman probation eligible, Mr. Lyman is eligible for probation under federal law. *PSIR*, p. 17.   Similarly, Mr. Lyman is statutorily eligible for In-Home Detention, which pursuant to 18 U.S.C. § 3563(b)(19) would be imposed as a condition of probation.  One other factor to consider is that, if the Court were to apply a four-level downward variance either based upon the justifications set forth by the Probation Department or for the reasons set forth in this pleading, then Mr. Lyman would be in Zone B of the sentencing table which authorizes a probationary sentence with in-home detention.  *See* USSG §5B1.1 Note 1(B).

### 4. The Types and Length of Sentence When Applying the Guidelines.

This factor is discussed *ad nauseum* within the PSIR (Doc. # 39), the Defense Objections and Corrections to the PSIR (Doc. #40), Doc #42 and this pleading.  For the reasons set forth throughout these pleadings, this Court should both vary and depart

11

from the imposition of a strict guidelines sentence.

## **CONCLUSION**

For the reasons explained in this motion, there are compelling reasons why this Court should impose either a probationary sentence or a sentence of in-home detention. These reasons range from Mr. Lyman's personal characteristics to the mitigating nature of the events leading to Mr. Lyman's commission of the crime, and also include factors such as Mr. Lyman's health, mental health, COVID-19 and the need to keep non-violent offenders our of prison, the DEA's continued transactions with Mr. Lyman beyond the point that was necessary and the agreement amongst all parties that Mr. Lyman is unlikely to reoffend.  For these reasons and others discussed within this pleading, Mr. Lyman requests that the Court impose a non-guideline probationary sentence or a probationary sentence consisting of in-home detention.

Respectfully submitted this 4th day of November 2020.

**AVISO LAW LLC**

*/s/Ryan S. Coward*
Ryan S. Coward, #38906
618 N. Tejon St.
Colorado Springs, CO 80903
Telephone: (719) 247-3111
Fax: (719) 297-3814
E-Mail:  ryan@avisolawllc.com

## CERTIFICATE OF SERVICE

  I hereby certify that on the 4th day of November 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will serve the pleading upon the parties and the court.

                */s/Ryan Coward*
                Ryan Coward

13