IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-CR-245-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. CHRISTOPHER LYMAN,

    Defendant.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
## FOR NON-GUIDELINE SENTENCE

The United States of America, by and through the undersigned Assistant United States Attorney, respectfully submits this response to the defendant's motion for a non-Guideline sentence.

On November 4, 2020, the Government submitted a motion for a non-Guideline sentence of a year and a day, joining the Probation Department's recommendation for a downward variance from the defendant's Guidelines range of 18-24 months' imprisonment.  [Dkt #42].  Also on November 4, 2020, the defendant submitted a motion for a non-Guidelines sentence of probation or in-home detention. [Dkt #45].  On November 6, 2020, the Court ordered the Government to respond to the defendant's motion.  [Dkt #50].

The Government continues to believe that its original recommendation of imprisonment of a year and a day is appropriate, and nothing in the defendant's motion persuades the Government otherwise.  Though the Government credits the defendant's

1

assertion that he was navigating a rough patch in his life in 2018 and 2019, that does not excuse the defendant's criminal behavior.

The defendant claims that he "did not seek out those involved in the illegal drug trade as part of his Bitcoin exchange business . . . [but he] also did not cutoff ties when he learned that the confidential source he was speaking to was involved with marijuana." [Dkt #45 p. 4]. While this is true, the defendant did more than simply treat the purportedly marijuana-dealing undercover officer ("UC") as another client for whom the defendant sought to exchange bitcoin for cash. Rather, the defendant actively counseled the UC—whose role was that of an aging marijuana dealer with little financial sophistication and no knowledge of bitcoin—on how to best conceal his drug proceeds.

In the very first meeting with the UC, on November 27, 2018, after the UC explained that he has cash from selling marijuana and expressed his desire to keep his identity a secret, the defendant explained the features of bitcoin that allow anonymity in transactions. [PSR ¶ 18]. The defendant went on, at length, about how the UC could launder his money. The defendant explained that the UC could use checks to accomplish this goal by buying bitcoin from the defendant and then buying the bitcoin back with a check written to a business in order give the transaction the appearance of legitimacy. [PSR ¶ 19]. While discussing how much cash the UC wanted to exchange for bitcoin, the UC explained that the amount of the transactions would depend on the volume of his marijuana business. [PSR ¶ 20]. The defendant said he wanted to be the UC's "bank." [PSR ¶ 21]. In this first meeting, the defendant exchanged $1,000 of the UC's cash for bitcoin, and explained it was best to start with smaller transactions to keep up the appearance of legitimate business. [PSR ¶ 24].

On December 10, 2018, the UC and defendant met again. [PSR ¶ 25]. The defendant resumed his previous educational campaign about the importance of maintaining the appearance of a legitimate business while laundering money, and proposed that he sell the UC bitcoin and write a check for the same amount to the UC's business account. The defendant explained this is a good method of laundering money because it gives a "story" for the transaction. The defendant also offered to forgo bitcoin entirely and simply write business checks for the defendant's cash. [PSR ¶ 26]. During this meeting, the UC gave the defendant $5,000 in exchange for bitcoin, less the defendant's commission. [PSR ¶ 25].

On January 10, 2019, the UC and defendant met again, and the defendant implemented his plan to use business checks to launder the UC's money—this time, $15,000. [PSR ¶ 27]. The defendant gave the UC two checks from his business account on which the defendant noted they were for "plumbing #4256" and "electrical #4189." The defendant explained these words were meaningless, but are important to keep up the appearance of legitimacy. [PSR ¶ 27].

On February 12, 2019, the UC and defendant met again to transact $75,000 worth of bitcoin. [PSR ¶ 28]. Ultimately, the defendant was able to sell $66,000 worth of bitcoin to the UC, less the defendant's commission. [PSR ¶ 25].

On May 17, 2019, the UC and defendant had a fifth meeting. This time, the defendant brought acquaintances with him, including an individual who the defendant arranged to provide some of the bitcoin for the UC. [PSR ¶ 29]. Ultimately, the defendant and his companion sold the UC around $110,000 worth of bitcoin for cash. [PSR ¶ 30]. The defendant was arrested after this meeting. Among other things, the

defendant was carrying a backpack containing a handgun and magazine loaded with ammunition. [PSR ¶ 32].

As the above-described narrative shows, the defendant was not simply a passive participant in the UC's money laundering operation. Rather, he actively counseled the UC (who, again, was playing the role of someone completely naïve about the modern financial system) on how to best give his transactions the appearance of legitimacy. The Government does not doubt that the defendant was in the money exchanging business simply to make extra money (which is, by itself, unlawful without a license, regardless of whether the defendant knew he was laundering drug proceeds) but instead of walking away from the UC when it because immediately appearance that the UC was a drug dealer, the defendant instead ingratiated himself with the UC and spent hours counseling the UC on money laundering techniques. This conduct is serious—individuals like the defendant are the brains behind every successful drug dealing operation. A sentence of incarceration is warranted here.

The ongoing pandemic does not change this analysis. Despite having already contracted and recovered from COVID-19 this summer [Dkt #45 p. 5], the defendant still argues that the pandemic is relevant to his sentencing. While it may be possible to contract the virus twice, this is not a reason to keep the defendant—who is surely less likely to contract the virus at this juncture than other defendants before this court—out of prison. Moreover, the defendant's proffered chronic health conditions (hives, depression, and anxiety), while no doubt of concern to the defendant, are well within the BOP's ability to treat and manage, if necessary. Ultimately, the defendant's personal and health circumstances do not counsel again a sentence of incarceration here.

Respectfully submitted this 12th day of November, 2020.

        JASON R. DUNN
        United States Attorney


    By: *s/ Andrea Surratt*
      Andrea Surratt
      Assistant United States Attorney
      U.S. Attorney's Office
      1801 California St., Suite 1600
      Denver, CO 80202
      Telephone: (303) 454-0100
      e-mail: Andrea.Surratt@usdoj.gov
      Attorney for the Government